UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SASHA McGARITY,

                    Plaintiff,          Civil Action No. 19-11316
                                        Honorable Bernard A. Friedman
                                        Magistrate Judge David R. Grand
v.

BIRMINGHAM PUBLIC SCHOOLS,

                    Defendant.
_____/

### REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 37) AND GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 55)

This is an employment discrimination action brought by plaintiff Sasha McGarity ("McGarity") against her former employer Birmingham Public Schools ("BPS"). McGarity was a paraprofessional at BPS, and was terminated during her initial 90-day probationary period. In her complaint, McGarity asserts claims of race discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e, *et seq*., and a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C.A. § 206. (*Id*. at PageID.15.)[1]

On May 18, 2020, McGarity filed a motion for summary judgment. (ECF No. 37.) With the Court's permission, BPS responded after the close of discovery, a few months later. (ECF. Nos. 38, 65.) On August 3, 2020, BPS filed a motion for summary judgment. (ECF No. 55.) McGarity responded, BPS replied, and McGarity filed a supplemental brief. (ECF Nos. 60, 63, 64.)

_____

[1] This case was referred to the undersigned for all pretrial matters under 28 U.S.C. § 636(b). (ECF No. 29.)

For the reasons set forth below, it is **RECOMMENDED** that McGarity's motion for summary judgment (**ECF Nos. 37**) be **DENIED** and BPS's motion for summary judgment **GRANTED** (**ECF No. 55**).

## I.    REPORT

### A. Facts

On August 28, 2018, BPS hired McGarity as a special education paraprofessional at West Maple Elementary.  (ECF No. 1, at PageID.12.)  BPS classified her as a "probationary employee" for 90 days following her hire—from August 28, 2018 through January 22, 2019.  (ECF 37-2, PageID.179.)   As a probationary employee, BPS had the "unconditional right to terminate" McGarity at-will without triggering the grievance procedure in the Paraprofessional Collective Bargaining Agreement.  (ECF No. 55-6, PageID.556.)  According to McGarity, her job was to "[a]ssist the teacher [and] assist the special needs student."  (ECF No. 55-4, PageID.529.)

McGarity also acknowledges that special education students are to be educated in the least restrictive environment (LRE).  (ECF No. 60-2, *Id*. at PageID.849.)  Attached to her response to BPS's motion for summary judgment is a description of LRE.

> [E]very attempt will be made to first serve disabled students in the context of a regular education classroom.  Other more restrictive environments such as resource rooms, self-contained classrooms, or settings outside of a District school will be considered only after consideration has been given by the IEPC [Individualized Education Plan Committee] as to the feasibility of placement in the regular classroom.

(*Id*.)

McGarity spent most of her work day rotating between the general education classrooms, where she worked one-on-one with her assigned students.  (*Id*. at PageID.836.)  The special education students at West Maple at the time had a wide range of disabilities including learning disabilities, cognitive impairments, emotional impairments, behavioral issues, and Down's

Syndrome.  (ECF No. 55-4, PageID.530-533.)  The special education teachers in the Learning Resource Classroom ("LRC") would assign McGarity her schedule and students.  (ECF No. 55-4, PageID.529.)  Communication between McGarity and the LRC teachers was a necessary part of McGarity's position.  (*Id*. at PageID.545.)  The LRC teachers at West Maple during the 2018/2019 school year were Claire Theys and Grace Weiss.  (*Id*. at PageID.529.)

McGarity took her breaks and lunches in a vacant classroom by herself, or alone in her car.  (ECF No. 55-4, PageID.536; ECF No. 60, PageID.801.)  McGarity admits that "conflict arose between [she] and the LRC teachers" (ECF No. 60, PageID.801), and she then stopped visiting the LRC room altogether (ECF No. 55-8, PageID.561; No. 55-18, PageID.591).  Both Weiss and Theys averred in their declarations that McGarity did not communicate with the teachers in the manner that was expected or necessary to best serve the students.  (*Id.*)  The following averments from Weiss' declaration exemplify their similar concerns:

> 7.  The paras—except Sasha—would keep contact with us throughout the school day as well. We would informally meet in the hallways, we would see them during breaks, or at lunch. During these interactions, we were always communicating about the students. These conversations are very important for serving our students.
>
> * * *
>
> 11.  I began noticing issues with Sasha in October 2018.
>
> 12.  Before that, Sasha did come to the LRC room before class began but would occasionally throughout the day. She was quiet and would rarely interact with anyone from our team. Sometime in October, she stopped coming to the LRC room altogether. I had no idea where she was for a while. I came to find out she would spend her time in the morning, during breaks, and at lunch, in a vacant classroom by herself. No one knew what was going on with her, and she would not share information with us about the students she was working with.
>
> 13.  As October progressed, Sasha would not talk to me when I did see her. I asked simple things, like if a specific student completed assignments. Initially, Sasha gave short, terse responses, with no information.

> 14. By November 2018, Sasha would not respond to me at all when I would
> be in the same classroom as her. At this point, Sasha was still not coming to
> the LRC room. When I would run into her in the hall, I would try talking
> with her.  She would not respond to anything I said, so I had no idea if she
> understood what I was trying to communicate about the students.

(ECF No. 55-18, PageID.591.)

McGarity's own testimony might not confirm Weiss' most concerning averments, but it does corroborate that McGarity made the conscious decision to be independent rather than communicating with the LRC teachers :

> Q. Did there become a time when you preferred contacting one [Weiss or
> Theys] over the other?
> A. There came a time when I didn't want to contact either.  I wanted to be
> able to stand on my own. . . . I wanted to be able to do it on my own.

(ECF No. 55-4, PageID.534.)

Further, although McGarity explained that, from her perspective, she did not believe she had a "communication issue" with Weiss and/or Theys, she agreed that they might have had such an issue with her because "[e]verything is open to interpretation . . . So, a lack of communication could be myself just being, trying to be independent and servicing the students on my own without guidance."  (*Id.*, PageID.539.)  When asked, "How often would you communicate back with the teachers about the progress of the students?," McGarity simply answered, "I do not recall."  (*Id.*, PageID.535.)  And, when questioned about her relationship with Weiss, McGarity responded, "My goal is to do my job and go home.  My goal is not to make friends at work."  (*Id.*, PageID.536.)

Regardless of McGarity's belief about the appropriateness of her communication style, it is undisputed that in November, in the middle of her probationary period, Weiss and Theys began raising their concerns about McGarity's communication with the Principal of West Maple, Jason Pesamoska.  (ECF No. 55-8, PageID.562; ECF No. 55-18, PageID.592.)  These concerns centered around her lack of in-person communication, and her tendency to use the LRC classroom

4

immediately when a student showed difficulties in the general education classroom, instead of attempting to work with the student in the LRE first. (*Id*.) At Principal Pesamoska 's instruction, the LRC teachers tried meeting with McGarity to address these issues. (ECF Nos. 55-8, 55-18.) During these meetings, the LRC teachers reviewed expectations and offered guidance. (*Id*). In late November 2018, the LRC teachers changed McGarity's schedule and assigned her a different student. (*Id*.)

In early December 2018, the LRC teachers scheduled another meeting with McGarity to once again address their growing concerns and to give her another new schedule. (ECF Nos. 55-8, 55-18.) McGarity did not attend the scheduled meeting. (ECF No. 55-4, PageID.539.) The LRC teachers then reported their concerns again to Principal Pesamoska. (ECF Nos. 55-8, 55-18.)

On December 13, 2018, Principal Pesamoska met with McGarity regarding the LRC teachers' complaints. (ECF No. 55-13, PageID.577.) Pesamoska directed McGarity to communicate with the LRC teachers daily regarding her students. (*Id*.) Five days after this meeting, Pesamoska e-mailed McGarity to see if she "had an opportunity to touch base with Grace [Weiss] and Claire [Theys] … to make sure that those lines of communication have been opened." (ECF No. 55-14, PageID.580.) McGarity responded that they "were supposed to meet but it didn't happen." (*Id*.) Principal Pesamoska instructed McGarity "to touch base with them before the end of the day tomorrow," meaning Wednesday, December 19, 2018. (*Id*.)

McGarity finally met with the LRC teachers. (ECF Nos. 55-8, 55-18.) During the meeting, the teachers raised concerns with communication and sending student K.E. to the LRC too frequently, instead of working with him in the class. (ECF No. 55-4, PageID.540.) At that time, Pesamoska decided to investigate these complaints on his own. (ECF No. 55-11.) He interviewed two other special education paraprofessionals, four general education teachers, and the school

secretary.  (*Id.*)  All seven witnesses confirmed the LRC teachers' observations about McGarity's communication issues and difficulties with certain students.  (*Id*.)  For example, notes of Pesamoska's interviews report the interviewees as saying things like, "[McGarity] has not spoken more than two words to me," "stand-offish not willing to build relationships with adults," "refusal to engage with the team at all . . . didn't know if she understood [Weiss] and [Theys] were supervisors and if she did didn't act like it," "always off to self, not welcoming," and "not receptive to suggestions from classroom teacher and would shut teacher down and talk back to her."  (*Id.*)

On December 21, 2018, Principal Pesamoska met with McGarity again regarding these issues and explained she needed to communicate with the LRC teachers.  (ECF Nos. 55-4, PageID.541; No. 55-15, PageID.582; No. 62, PageID.910-11.)  Principal Pesamoska gave McGarity a choice between either transferring to a new building, or meeting with union representation to work things out with the LRC teachers.  (*Id*.)  On January 1, 2019, McGarity sent Principal Pesamoska a text message stating that she wanted to work things out with the LRC teachers.  (ECF 37-2, PageID.181.)

Upon returning to school on January 2, 2019, however, McGarity consciously decided not to communicate at all with the LRC teachers:

> Q.  And what happened when you returned to school?
> A.  We were supposed to gather a meeting to, you know, discuss my issues with Grace and Claire.  And did I talk to them?  No.  I did my job and I went home. . . . I did my job and went home.  Did I talk to them?  No.  I did not want to talk to them.  I was still very angry.

(ECF No. 55-4, PageID.541-42.)

On January 4, 2019, at 9:03 a.m., McGarity e-mailed Robyn O'Keefe, the President of the Birmingham Association of Paraprofessionals, stating:

> I do not feel comfortable meeting with the group alone.  I have just decided to file a grievance to express some unfair treatment.  I will submit the

> complaint by 8pm tonight.  I would like to meet on Monday or Tuesday morning in order to get this resolved as soon as possible.  If the process takes time that's fine with me.  I will just need to let the principle [sic] know.  I appreciate your assistance on this matter.

(ECF No. 37-2, PageID.182.)

On January 8, 2019, Principal Pesamoska e-mailed McGarity and scheduled a meeting for January 10, 2019.  (ECF No. 55-16, PageID.584.)  He stated: "Dean Niforos, Human Resources, along with Laura Mahler, Special Education will be in attendance.  I have also included Robyn O'Keefe on this e-mail, so she is aware and also knows if you wish to have union representation."  (*Id.*)  During the January 10th meeting, Pesamoska terminated McGarity's employment due to BPS's "concerns with [her] lack of communication with the LRC teachers . . ."  (ECF No. 61, PageID.888; No. 37-2, PageID.183; No. 62, PageID.910-11.)

On May 6, 2019, McGarity filed suit against BPS alleging race discrimination and retaliation under Title VII and the FLSA.  (ECF No. 1.)  On May 18, 2020, well before discovery closed, McGarity filed a motion for summary judgment.  (ECF No. 37.)  The Court allowed BPS to respond to that motion after the close of discovery, and the motion has been fully briefed.  (ECF Nos. 39, 44, 60, 65.)  BPS filed its own motion for summary judgment on August 3, 2020.  (ECF No. 55.)  McGarity responded, BPS replied, and McGarity filed a supplemental brief that BPS has moved to strike.  (ECF Nos. 55, 60, 63, 64, 66.)[2]

---

[2] Also before the Court are the parties' competing motions for sanctions (ECF Nos. 53, 69), which the Court will mainly address in a separate Order.  Most all of the issues raised by these motions concern the parties' alleged improper litigation behavior and do not directly bear on the merits of this case.  The only issue of any substance is McGarity's contention that BPS failed to allow her to take the deposition of Laura Mahler, who (1) held an administrator position in BPS's Special Education Department and attended the meeting at which McGarity was terminated, (2) is allegedly Theys's mother, and (3) allegedly was one of the decision-makers in McGarity's termination.  (ECF Nos. 53, 44.)  Attached to its own sanctions motion, BPS provided copies of recent e-mails that its counsel sent to McGarity offering her an opportunity to depose Mahler.  (ECF No. 69-10.)  At oral argument on the pending motions, the undersigned explained to

### B.     The Applicable Legal Standards

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an

---

McGarity that the present record did not seem to favor her position as to some of the central issues before the Court – including whether BPS's proffered reason for her termination was pretext – and that her allegations about Mahler's involvement, which related to that issue, were unsupported by evidence. Accordingly, the undersigned offered McGarity the opportunity to take Mahler's deposition and supplement the briefing. McGarity expressly declined the Court's invitation and indicated that she wished to have the pending summary judgment motions decided on the current evidentiary record.

affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

A moving party with the burden of proof (typically the plaintiff) faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). As set forth above, the moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial. "But where the moving party has the burden – the plaintiff on a claim for relief or the defendant on an affirmative defense – his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986) (internal citations omitted). Accordingly, summary judgment in favor of the plaintiff "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Harris v. Kowalski*, 2006 WL 1313863, at *3 (W.D. Mich. May 12, 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).

## C.     Analysis

### 1.     *BPS is Entitled to Summary Judgment on McGarity's Race Discrimination Claim*

#### a.  *McGarity Establishes a Prima Facie Case*

McGarity claims her termination is a result of race discrimination. McGarity does not have direct evidence of race discrimination, so she must use the familiar burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under this framework,

McGarity must establish a prima facie case of discrimination by showing that: (1) she "was a member of a protected class;" (2) she "suffered an adverse employment action;" (3) she "was qualified for the position;" and (4) she "was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc*., 455 F.3d 702, 707 (6th Cir. 2006). If McGarity can establish these elements, then the burden shifts to BPS to articulate a legitimate, nondiscriminatory reason for her termination. *Id*. If BPS does so, then, to survive summary judgment, McGarity must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for race discrimination. *Id*.

In her motion for summary judgment, McGarity simply states that she has proven her *prima facie* case. (ECF No. 37, PageID.159.) At least in its own summary judgment motion, BPS does not seem to dispute this, as its first substantive argument is that "[McGarity's] Termination was Based on Legitimate Non-Discriminatory Reasons." (ECF No. 55, PageID.496.) At any rate, the Court notes that McGarity, as an African-American is member of a protected class, and that she was terminated, which means she suffered an adverse action. Her qualifications for the paraprofessional job do not seem to be in dispute, and in his deposition, Principal Pesamoska confirmed McGarity's contention that BPS replaced her with a Caucasian female. (ECF Nos. 60, PageID.818; No. 61, PageID.894; No. 60-2, PageID.868.) Therefore, the Court finds that McGarity has established a *prima facie* case.

> b. *BPS Articulates a Non-Discriminatory Reason for Terminating McGarity's Employment*

Having established a *prima facie* case, the burden shifts to BPS to "articulate some legitimate, nondiscriminatory reason" for McGarity's termination. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978). Failure to meet performance expectations is a legitimate, non-

discriminatory reason for termination.  *Cicero v. Borg-Warner Auto*, 280 F.3d 579, 588 (6th Cir. 2002).   Even a personality conflict is a legitimate nondiscriminatory reason for termination. *Martin v. Toledo Cardiology*, 548 F.3d 405, 413 (6th Cir. 2008).   Here, BPS asserts that it terminated McGarity due to the ongoing inadequate communication with LRC teachers and her failure to meet job performance standards, as described above.  (ECF No. 55, PageID.496-97.) This sufficiently articulates a legitimate non-discriminatory reason for terminating McGarity. Consequently, the burden shifted to McGarity to prove that BPS's reason is pretext for unlawful discrimination.  *Manzer v. Diamond Shamr. Chem.,* 29 F.3d 1078, 1084 (6th Cir. 1994).

c.   *McGarity Fails to Raise a Material Question of Fact that BPS's Proffered Reason for Her Termination is Pretext*

McGarity may establish pretext by showing "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge."  *Id*.  The Sixth Circuit has held that an employer's business judgment should not be questioned as a means of establishing pretext because the issue is not whether the decision was wrong or mistaken but whether the decision was discriminatory. *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996), cert. denied, 519 U.S. 1055 (1997).   Courts should instead defer to sound business judgment to avoid "the illegitimate role of acting as a 'super personnel department,' overseeing and second guessing employers' business decisions."  *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 628 (6th Cir. 2006).  BPS argues that McGarity cannot prove pretext under any of the three types of showings listed above.  (ECF No. 55, PageID.497-504.) The Court agrees.

First, as shown above, BPS's reasons proffered for termination are based in fact.  McGarity admits that communication was a necessary part of her job.  (ECF No. 55-4, PageID.545.) McGarity cannot dispute that the LRC teachers had issues with the manner and frequency in which

11

she communicated with them, and that those concerns were conveyed to Pesamoska, leading to his investigation. (ECF Nos. 55-8; 55-18.) Nor does McGarity dispute that after Pesamoska specifically instructed her to meet with the teachers so the issue could be addressed, she still had not done so five days later, claiming simply that she knew she was supposed to meet with them "but it didn't happen." (ECF No. 55-14, PageID.580.) McGarity also admits that she ceased communicating with the LRC teachers after they voiced their concerns to Pesamoska. (ECF No. 55-4, PageID.541-42) ("And did I talk to them? No. I did my job and I went home. . . . I did my job and went home. Did I talk to them? No. I did not want to talk to them. I was still very angry."). Finally, it is undisputed that Pesamoska met with at least seven of McGarity's colleagues to investigate the complaints about her lack of communication, and that they all provided similar negative comments about her communication skills. (ECF No. 55-11; *see supra* at 5-6.) In short, BPS's concerns about McGarity's communications skills are based on facts borne out by evidence in the record.

McGarity's attempts to raise a material question of fact as to the proffered reasons for her termination fail. First, she attached various text messages to her motion for summary judgment, which she claims shows she did communicate with her colleagues. (*See e.g.*, ECF No. 37-2.) But McGarity cannot unilaterally decide what form of communication is appropriate. Indeed, the LRC teachers do not dispute that McGarity texted, but state that it is part of the job to meet in person daily to discuss students and accommodations, and no reasonable juror would conclude otherwise in the school setting in which McGarity worked. (ECF Nos. 55-8, 55-18.) Second, while McGarity acknowledges that she spent her breaks by herself in the vacant classroom or her car, instead of the LRC room, she asserts there is nothing wrong with this and provides an exhibit showing that breaks for paraprofessionals are supposed to be "duty free." (ECF No. 55-4, PageID.536; ECF

No. 64-1, PageID.949.)  Even so, this conduct is entirely consistent with BPS's concerns about McGarity's overall ineffective communication with her co-workers, and does not raise a material question of fact that the stated reason for her termination was pretext for race discrimination. Moreover, even ignoring McGarity's "break time" conduct, BPS presented ample evidence of communication issues that would warrant termination.  *See e.g., supra* at 11-12.

McGarity also relies on a few thank you cards from students and parents, and Pesamoska's written recommendation of McGarity for an aide position at the school's Kids Club.  (*See e.g.*, ECF No. 37-2, PageID.174-75; No. 60-2, PageID.838, 847.)  But this evidence also fails to raise a material question of fact on the issue of pretext.  The fact that some students and their families appreciated McGarity reflects positively on her, but BPS never said it terminated her because she had no positive relationships with students or parents.  And, although Pesamoska did recommend McGarity for a Kids Club aide position, noting that she "works well with students," this was early in McGarity's probationary period, and "well before" Weiss and Theys had advised Pesamoska about their concerns with McGarity's lack of communication and Pesamoska's ensuing investigation.  (ECF No. 60-2, PageID.838; No. 62, PageID.903.)  Moreover, the Sixth Circuit has found that the mere fact that the plaintiff had received positive feedback prior to her discharge does not establish a discriminatory motive:

> The central theme of [the plaintiff's] argument is that, because he continued to receive good performance evaluations and merit pay increases even after the incidents which [the defendant employer] cited as illustrative of his inaccuracy and combative attitude, those explanations must be incredible. This argument is misdirected.  The issue is not whether [the plaintiff] was truly "obnoxious" enough, or "unreliable" enough, to justify firing him. Nor are we concerned with why [the defendant employer] retained [the plaintiff] as long as it did.  Those are precisely the type of "just cause" arguments which must not creep into an employment discrimination lawsuit.  [The defendant employer] asserts that these are the reasons [the plaintiff] was fired and, in the absence of [evidence raising a material question of fact as to pretext], its explanations must be accepted.

13

*See Manzer*, 29 F.3d at 1084-85.

McGarity's attempts to explain her viewpoint of the communication issue discussed above are immaterial under "the honest belief rule." *See Miles v. South Central Human Resource Agency, Inc.*, 946 F.3d 883, 897 n. 5 (6th Cir. 2020). Under this rule, as long as BPS had an "honest belief" in the nondiscriminatory reason for terminating McGarity, then McGarity cannot establish that the reason was pretextual even if it were later determined to be incorrect. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)(citations omitted). An employer has "an honest belief" in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made. *Todd v. RBS Citizens, N.A.*, 483 Fed. App'x 76, 83 (6th Cir.2012). The decisional process need not be optimal but only "reasonably informed and considered." *See Michael v. Caterpillar Fin. Serv. Corp.*, 495 F.3d 584, 589-99 (6th Cir. 2007); *see Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006). McGarity has failed to raise a material question of fact that Principal Pesamoska reasonably believed the reasons for terminating McGarity were true due to his own observations and investigation. The evidence is undisputed that Principal Pesamoska addressed the LRC teachers' complaints with McGarity, and that she did not deny the allegations against her, but instead "just stayed quiet." (ECF No. 55-4, PageID.542; ECF No. 55-13.) Then, Pesamoska interviewed numerous other West Maple employees who had first-hand knowledge about McGarity's work performance, and they all voiced similar serious concerns about her communication skills. (ECF No. 55-11.) Finally, McGarity admits that after the meeting and her return from break, she did not speak with Weiss or Theys at all. *See supra* at 6. Based on all of those facts, Pesamoska made a reasonably informed and considered decision to terminate McGarity for non-discriminatory reasons. Again, this shows that McGarity failed to raise a material question of fact on the issue of

14

pretext.

Finally, McGarity cannot prove that the proffered reasons did not actually motivate her discharge. *Manzer*, 29 F.3d at 1084. To prove pretext under this prong, McGarity must adduce evidence of discriminatory motive. *Id*. McGarity must prove that the "sheer weight of circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id*. McGarity first attempts to prove that her performance problems did not actually motivate her discharge by attaching text messages and phone bills showing she contacted the LRC teachers. (ECF No. 60, PageID.815.) She claims that under *Westmoreland v. TWC Administration*, 924 F.3d 718, 726-27 (4th Cir. 2019), that this is sufficient to survive summary judgment. (ECF No. 60, PageID.815.) The Court disagrees.

In *Westmoreland*, an age discrimination case, the Court held that an employee successfully rebutted the employer's reasonable, non-discriminatory reason for discharge with evidence of a replacement outside of her protected class and a remark that the plaintiff could now take care of her grandbabies. *Westmoreland* – a Fourth Circuit case – is not binding on this Court. Moreover, McGarity's case is distinguishable from *Westmoreland*, where the evidence of pretext and motivation was a remark that referred to the plaintiff's age. Here, McGarity points only to Weiss' purported statement, suggesting that McGarity "put in her two weeks' notice and leave." (ECF No. 60, PageID.823.) Unlike the statement in *Westmoreland*, nothing about Weiss' alleged statement suggests it was motivated by race. And, as discussed above, whether McGarity occasionally communicated with her colleagues via text message is immaterial to the reason she was terminated – her failure to communicate in-person regularly about the students' needs while at work.

McGarity's attempt to prove that her performance problems did not actually motivate her

discharge by alleging that nepotism was the real reason for her discharge also fails.  She alleges that the Director of Special Education, Laura Mahler, is Theys's mother, and that Mahler violated BPS's conflict of interest policy when she attended McGarity's termination meeting.  (ECF No. 60, PageID.820; 55-4, PageID.544; 60-2, PageID.869.)  However, McGarity has not presented any evidence that Mahler had any input into the termination decision.[3]  (ECF No. 55-4, PageID.542-43; ECF No. 61, PageID.888.)  And, even if McGarity is correct that Mahler's attendance at the meeting violated BPS policy, that does nothing to save her claim.  As the Sixth Circuit explained in *Williams v. Columbus Metropolitan Housing Authority*, 90 Fed. Appx. 870, 876 (6th Cir. 2004), "an employer's failure to follow its own regulations and procedures, alone, is not sufficient to support a finding of pretext."  Moreover, Mahler recommended McGarity for the position (ECF No. 55-5), so it makes little sense to suggest that she would now discriminate against McGarity based on her race.  *See Garrett v. SW Med. Clin.*, 631 Fed.Appx. 351, 357 (6th Cir. 2015)(under the "same actor inference," when the same person who hired plaintiff also fired plaintiff, there is a presumption that an employee's race did not motivate the termination)).  In short, McGarity fails raise a material question of fact that Mahler's attendance at the termination meeting was in any way a motivating factor in the decision to terminate her, or that the proffered reasons for her termination were pretext.

Finally, McGarity failed to raise a material question of fact that BPS's proffered reasons for termination were insufficient to warrant her termination.  This type of argument is ordinarily proven with evidence that similarly situated employees were treated more favorably for the same conduct that resulted in the adverse action against the plaintiff.  *Manzer*, 29 F.3d at 1084.  It is

---

[3] As explained above, *supra* at 7-8, McGarity expressly declined the opportunity to depose Mahler about these matters.

McGarity's burden to establish that similarly situated employees were treated differently than she was. *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357 (6th Cir. 2006). "To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar 'in all of the relevant aspects.'" *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008). To be "similarly situated," employees generally must "'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). A plaintiff fails to meet her burden if she offers no "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084.

McGarity seems to argue that Julie Shimshock is a similarly situated employee. (ECF No. 60, PageID.819.) However, the facts simply do not bear this out. Shimshock started working as a paraprofessional at West Maple Elementary School in 2007. (ECF No. 63-3, PageID.929.) Thus, BPS employed her well beyond her probationary period, making her not similarly situated to McGarity who was terminated during her probationary period. (*Id*.) The issues involving the employees are also not similar. McGarity claims that Shimshock received favorable treatment due to her race when she had an incident involving a student. (ECF No. 60, PageID.819.) But the incident in question involved an agitated student who became physical, throwing items and grabbing Shimshock around her legs. (ECF No. 63-3, PageID.934.) Shimshock radioed for assistance, but did not physically engage with the student. (*Id.*) BPS put Shimshock on paid leave while it investigated this incident. (*Id*.) BPS determined that Shimshock responded appropriately.

(*Id.*)   In contrast, after complaints were made regarding McGarity's communication issues, Principal Pesamoska conducted a thorough investigation which corroborated the complaints and their seriousness.  (ECF Nos. 55-11, 55-15.)  McGarity has not identified any other employee who had performance issues similar to McGarity's, and who was treated more favorably.  As such, she cannot prove pretext under the third prong.

For all of these reasons, BPS is entitled to summary judgment on McGarity's Title VII race discrimination claim.

### 2.  *BPS is Entitled to Summary Judgment on McGarity's Retaliation Claim*

"Title VII prohibits an employer from retaliating against an employee who has either: (1) 'opposed any practice made an unlawful employment practice by this subchapter,' or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'"  *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (quoting 42 U.S.C. § 2000e–3(a)).  "These two provisions, respectively, constitute the 'opposition' and the 'participation' clauses."  *Id.*  To establish a *prima facie* case of retaliation under either clause of Title VII's anti-retaliation provision, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the defendant knew of the protected activity; (3) thereafter, the defendant took adverse action against her; and (4) a causal connection existed between the protected activity and the materially adverse action. *Id.* (citing *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir.2013)).  The same *McDonnell Douglas* burden-shifting framework discussed above then applies; if the plaintiff establishes a *prima facie* case of retaliation, the defendant must proffer some legitimate, nonretaliatory reasons for its actions, and if it does so, the plaintiff must show that those reasons were pretext for retaliation.  *Id.*  Importantly, the plaintiff must "establish but-for causation to establish the retaliation claim.  This standard 'requires proof that the unlawful

18

retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).

McGarity seems to assert two theories of unlawful retaliation. First, she argues that BPS improperly retaliated against her for requesting a union representative at the January 10, 2019 meeting. (ECF No. 37, PageID.161.) Second, McGarity seems to assert that she was retaliated against for various complaints and comments she made because of the alleged relationship between Mahler and Theys:

> The Plaintiff theorizes (1) Mahler terminated McGarity in retaliation for participating in a complaint process involving her daughter, (2) Mahler fired McGarity in retaliation for participating in process that could result in an EEOC charge because of her own admittance and awareness of Pesamoska's biased investigations into the plaintiff's performance and (3) Mahler terminated McGarity in retaliation because she advised Pesamoska in matters and wanted to protect her daughter and herself from repercussions should the matter escalate.

(ECF No. 60, PageID.822.)

McGarity's arguments fail for a few reasons. First, as noted above, McGarity declined to depose Mahler, and McGarity's "theory" about her involvement is not evidence sufficient to create a material question of fact. Second, even assuming McGarity can satisfy the first three elements of a retaliation claim, BPS is entitled to summary judgment because she fails to raise a material question of fact as to the issue of causation. *See Morris v. Oldham Co. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). "The element of causation which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007)(citations omitted). And, as noted above, in the Title VII retaliation context, to prove a causal connection, the plaintiff must establish heightened "but for" causation. *New Breed Logistics*, 783 F.3d at 1066. The Supreme Court has described this "but for" standard as a "more demanding" standard of proof than the "motivating factor" standard. *Nassar*, 570 U.S. at 362.

19

When determining the "but for" issue, the relevant question is whether the defendant would have taken the same adverse action even in the absence of the alleged protected conduct. *See Gross v FBL Fin Servs*, 557 US 167, 176, (2009). Temporal proximity alone is not enough to prove causation. *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986). This is especially true where, as here, the fact of temporal proximity is not particularly compelling because "the plaintiff's retaliation claim [is] otherwise weak and there [is] substantial evidence supporting the defendant's version of the events." *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000). Moreover, the Sixth Circuit has "held that an intervening cause between protected activity and an adverse employment action dispels any inference of causation." *Kenney v. Aspen Technologies, Inc.*, __F.3d__, 2020 WL 3638388, *4 (6th Cir. July 6, 2020). An intervening event is a "legitimate reason to take an adverse employment action" and "dispels an inference of retaliation based on temporal proximity". *Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013).

McGarity fails to raise a material question of fact as to causation. In December 2018, before McGarity accepted Pesamoska's offer to have a union representative at the early January meeting, it is undisputed that Pesamoska had multiple meetings with McGarity regarding her ongoing communication issues. (ECF Nos. 55-5; 55-14; 62, PageID.910-11.) During these meetings, Pesamoska told McGarity that she must communicate with the LRC teachers to continue as a paraprofessional at the school. (*Id.*) After returning to school on January 2nd, McGarity admits that she did not comply with Pesamoska's directive to communicate with the LRC teachers. (ECF No. 55-4, PageID.541-42.) When Pesamoska learned that McGarity ignored his order and was not communicating with the LRC teachers, he recommended her termination based on that conduct. (ECF No. 61, PageID.888; ECF No. 62, PageID.910-11.) Thus, McGarity's refusal to

20

communicate with the LRC teachers after January 1st is an intervening event that is a legitimate reason for her termination, and McGarity cannot prove that but for her earlier "request" for a union representative she would have remained employed.  In short, McGarity cannot use her request as a shield from the consequences of her ongoing refusal to follow her principal's orders to communicate with her supervisors.  *See Nassar*, 133 S.Ct. at 2532.

For all of these reasons, BPS is entitled to summary judgment on McGarity's Title VII retaliation claim.

### 3.   *BPS is Entitled to Summary Judgment on McGarity's Hostile Work Environment Claim*

In her complaint, McGarity vaguely alleges that Grace Weiss created a hostile work environment by recommending to McGarity that she put in her "two weeks" during their conversation on December 19, 2018.  (ECF 1, PageID.13.)  BPS argues that this one isolated comment does not, as a matter of law, create a hostile work environment.  (ECF No. 55, PageID.506-507.)  The Court agrees.

The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).  Such claims require proof of severe or pervasive, objectively offensive harassment based on race. *Russell v. University of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008).  The isolated non-race-based comment alleged by McGarity clearly does not meet that high threshold. *See Id*. (non-race-based comments that reflect on the plaintiff's work habits rather than racial animosity do not create a hostile work environment).  In her response to BPS's summary judgment motion on this issue, McGarity also makes vague accusations that her schedule "changed" twice.  (ECF No. 60, PageID.823.)  However, McGarity fails to explain this accusation in any further detail, let alone why any such change would rise to the level of creating a hostile work environment under

21

the stringent standard described above. *Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 299 (6th Cir. 2015) (Holding that mere shifting of work schedule "does not come close to being objectively hostile under our standard.").

Accordingly, BPS is entitled to summary judgment on McGarity's hostile work environment claim.

### 4.    *BPS is Entitled to Summary Judgment on McGarity's FLSA Claim*

McGarity claims that she was terminated in violation of the FLSA. The FLSA sets federal standards for minimum wage and overtime compensation for covered employees. *See* 29 U.S.C. §§ 206(a), 207(a). As such, an employer violates the FLSA if it violates the statute's minimum wage or overtime compensation provisions. To prevail on a FLSA overtime or minimum wage claim "a plaintiff must prove, by preponderance of the evidence, that [she] 'performed work for which [she] was not properly compensated.'" *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015)(quoting *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 687 (1946)).

McGarity seems to allege that BPS terminated her because she took her breaks duty free, meaning she did not communicate with her coworkers during her break. (ECF No. 64-1, PageID.949.) However, McGarity does not allege that BPS failed to properly compensate her for the time that she worked (including while on break) as required by the FLSA. (ECF No. 1.) As such, McGarity fails to state a cognizable claim under the FLSA, and BPS is entitled to summary judgment on this claim.

### 5.    *McGarity's Motion for Summary Judgment Should be Denied*

Above, the Court fully analyzed the evidence and arguments proffered by McGarity in this case and explained why it fails to defeat BPS's motion for summary judgment. In light of that conclusion, it goes without saying that McGarity's motion for summary judgment, on which she

faces a "substantially higher hurdle," *Arnett*, 281 F.3d at 561, should be denied.

## II.    RECOMMENDATION

For the reasons set forth above, it is **RECOMMENDED** that McGarity's motion for summary judgment (**ECF No. 37**) be **DENIED** and BPS's motion for summary judgment **(ECF No. 55)** be **GRANTED**.

Dated: November 3, 2020                    s/David R. Grand
Ann Arbor, Michigan                        DAVID R. GRAND
                                           United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. L.R. 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise,

and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 3, 2020.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager